1  **LAURA CONOVER**
   **PIMA COUNTY ATTORNEY**
2  J. William Brammer, Jr, SBN 002079
   Deputy County Attorney
3  william.brammer@pcao.pima.gov
   James W. Rappaport, SBN 031699
4  Deputy County Attorney
5  james.rappaport@pcao.pima.gov
   Joshua Moser, SBN 025642
6  joshua.moser@pcao.pima.com
   Chief Criminal Deputy County Attorney
7  32 North Stone Avenue
   Tucson, Arizona 85701
8  Telephone: (520) 724-5600
9  *Attorneys for the State of Arizona*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| THE STATE OF ARIZONA, by and through Pima County Attorney, LAURA CONOVER, <br><br> *Plaintiff/Petitioner*, <br><br> v. <br><br> PAM BONDI, in her official capacity as Attorney General of the United States; <br><br> GADYACES S. SERRALTA, in his official capacity as Director of the United States Marshals Service; <br><br> KRISTI NOEM in her official capacity as Secretary of Homeland Security; <br><br> VAN BAYLESS in his official capacity as United States Acting Marshal for the District of Arizona; | No. <br><br> **APPLICATION FOR WRIT OF HABEAS CORPUS AD PROSEQUENDUM AND COMPLAINT AND APPLICATION FOR PRELIMINARY INJUNCTION** |

|   |   |
|---|---|
| 1 | TIMOTHY COURCHAINE in his official capacity as United States Attorney for the District of Arizona; |
| 2 | |
| 3 | JOHN DOES 1-3, in their official capacities as Bureau of Prisons officials; |
| 4 | |
| 5 | |
| 6 | ROBERT ROES 1-3, in their official capacities as United States Marshals and Deputy United States Marshals, |
| 7 | |
| 8 | |
| 9 | *Defendants/Respondents*. |

Plaintiff/Petitioner the State of Arizona by and through Pima County Attorney, LAURA CONOVER (herein the "State"), alleges in support of this Application for a Writ of Habeas Corpus ad Prosequendum and Complaint and Application for Preliminary Injunction the following:

## INTRODUCTION

1. Julio Cesar Aguirre has committed multiple violent crimes that the State seeks to prosecute. Those crimes include first-degree murder, aggravated assault, and aggravated burglary, among others. The State cannot actively prosecute its already indicted case against Aguirre because the United States, without coherent explanation, has refused to produce him for an initial appearance or arraignment in state court.

2. The State's case involves several victims, two in their late 70s. Their testimony is critical to the State's case, but it cannot be preserved until they are deposed. Those depositions, in turn, cannot take place until Aguirre has an initial appearance and arraignment in state court. The United States is aware of this. Its

continued obstructionism therefore risks spoliating critical evidence without which Aguirre cannot be held fully accountable for his crimes.

3. To date, the United States has offered no justification, legal or otherwise, for its refusal to cooperate with the State beyond content-free, conclusory appeals to the "integrity" of their case.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 because this action arises under the laws of the United States and the United States Constitution.

5. This Court may grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

6. Venue is proper in the District Court for the District of Arizona under 28 U.S.C. § 1391(b) and (e)(1) because each defendant is an agency of the United States or an officer of the United States sued in their official capacity; Plaintiff is a duly elected official whose territorial jurisdiction falls within the District of Arizona; a substantial part of the events or omissions giving rise to this action occurred and continue to occur in the District of Arizona; and upon information and belief, the United States is holding Aguirre in a federal detention facility within the District of Arizona.

**PARTIES**

7. Plaintiff State of Arizona is a sovereign with the federal constitutional authority to bring criminal prosecutions for violations of its laws. Arizona is represented here by Pima County Attorney Laura Conover, the duly elected public

prosecutor of Pima County, Arizona, empowered and required to represent the State of Arizona in prosecutions for public offenses within geographical Pima County.

8. Defendant Pam Bondi, in her representative capacity, is the Attorney General of the United States with the authority to set policy for the Department of Justice, which includes the United States Attorneys for each United States federal judicial district.

9. Defendant Gadyaces S. Serralta, in his representative capacity, is the Director of the United States Marshals Service oversees and manages the operations of the Marshals Service and all United States Marshals Service personnel within their respective federal judicial district.

10. Defendant Kristi Noem, in her representative capacity, is the United States Secretary of Homeland Security with the authority to enforce laws relating to immigration and border security.

11. Defendant Van Bayless, in his representative capacity as United States Acting Marshal for the District of Arizona, oversees and manages the operations of United States Marshals Service personnel within the federal judicial district of Arizona.

12. Defendant Timothy Courchaine, in his representative capacity as United States Attorney for the District of Arizona, has the authority to implement the policies set by the Attorney General of the United States within the federal judicial district of Arizona.

13. Defendants John Does 1-3, Bureau of Prisons officials, in their representative capacities, are unknown at this time but, upon information and belief, oversee and manage the operations of the federal detention facility where Julio Cesar Aguirre is presently held. That location is unknown to the State at this time.

14. Defendants Richard Roes 1-3, United States Marshals and Deputy United States Marshals, in their representative capacities, oversee, manage, and carry out the operations of United States Marshals Service personnel within the federal judicial district

in which Julio Cesar Aguirre is presently held. That location is unknown to the State at this time.

## GENERAL ALLEGATIONS

15. On June 30, 2025, Julio Cesar Aguirre went on a one-man crime spree in Tucson, Arizona, culminating in the murder of R.M., and his victimization of six additional people.

16. Aguirre tried to enter into the home of R.T., breaking a bathroom window and pointing a gun at R.T. when R.T. investigated the sound of the breaking glass.

17. Aguirre shot R.M. while attempting to steal his truck. R.M. died the same day from the gunshot wound.

18. Aguirre pointed his gun at K.O. and R.S., two neighbors who had witnessed the murder.

19. Aguirre broke into the home of A.Q. and O.Q., a Tucson couple in their late 70s. While inside, Aguirre pointed a gun at them, threatened them, and tried to get them to drive him to Nogales. Their son-in-law, A.R., eventually arrived at the home to come to his parents-in-law's aid, and Aguirre threatened him with the gun. A.R. eventually helped his parents-in-law escape. A.R.'s niece, A.Q.'s and O.Q.'s granddaughter, was showering and locked in a bathroom for the entire incident.

## FACTUAL BACKGROUND

**A. First incident: Aguirre breaks into the home of a sleeping couple.**

20. At just before 6:30 a.m., Aguirre broke into R.T.'s home while he and his wife were asleep in their bedroom. They heard their bathroom window break. R.T. went into the bathroom to investigate and saw a man, later identified as Aguirre,

standing in the backyard outside the window. Aguirre pulled a black handgun from his waistband and pointed it at R.T. R.T. went back into his bedroom, and Aguirre fled. (Tucson Police Department reports, attached as Exhibit [Ex.] 1 at 29.)

### B. Second incident: Aguirre shoots and kills R.M. while trying to steal his truck.

21. At approximately 6:47 a.m., R.S. saw Aguirre arguing with R.M. as R.M. sat inside his truck, and Aguirre stood outside it. R.S. asked them what was going on, and Aguirre became very angry. R.S. told Aguirre, "Whatever you are doing, it's not worth it." Aguirre responded, "My life is already over," pulled out a black handgun, and shot R.M. R.S. retreated to her apartment in fear for her life. R.M. was transported to the hospital, where he was pronounced deceased at 7:25 a.m. (Ex. 1 at 20, 74-75, 93.)

22. K.O., who had been watering plants near R.M.'s truck witnessed Aguirre say to R.M., "I'm going to shoot you on the count of three if you don't give me the keys." She heard R.M. resist, and when Aguirre noticed K.O., he pointed his gun at her. K.O. sprayed Aguirre with the watering hose, and Aguirre turned away. K.O. went inside her home and called 911. (Ex. 1 at 66.)

### C. Third incident: Aguirre breaks into a home and holds three people at gunpoint.

23. At around 7:15 a.m., Aguirre burglarized another home. He arrived at the home of A.Q. and O.Q. A.Q. had been tending to his prickly pear cactus outside when he noticed Aguirre walking toward him. A.Q. tried closing the door behind him and locking Aguirre out of the home, but Aguirre forced his way inside. O.Q. noticed that Aguirre's arm was bleeding, and she grabbed a bandage and applied a tourniquet. O.Q. was able to place a call to her daughter for help. Aguirre noticed

and told her, "les va a muy mal" (Eng.: "things will go very badly for all of you"). (Ex. 1 at 32, 85, 124-126.)

24. Aguirre asked A.Q. for a ride to Nogales, but A.Q. refused. Aguirre's handgun was visible during this exchange. Aguirre forced A.Q. and O.Q. to swear to God that they were not going to call the police. Aguirre told them, "Si no, les va a pasar algo" (Eng.: "If not, something will happen to all of you.") Aguirre touched his gun while he was making them swear to God. Their son-in-law, A.R., then entered the home and confronted Aguirre. Aguirre pointed the gun at A.R.'s head. A.R. told Aguirre that the police had arrived, and Aguirre raised his gun at A.R. and his mother- and father-in-law, then pointed it at his own head, stating he was going to kill himself and was not going to be taken alive. A.R. then started to guide his mother and father-in-law out the front door and meet the law enforcement officers assembled there. During this incident, A.Q. and O.Q.'s granddaughter had locked herself inside the bathroom and was physically unharmed. (Ex. 1 at 85; 125-127.)

25. Aguirre then fled the home. He headed to a nearby alleyway. Police surrounded the area and began searching for Aguirre. With the help of a police K9 unit, officers eventually located Aguirre in a backyard shed. Police apprehended Aguirre and took him into custody at 9:16 a.m. They took Aguirre to Banner University Medical Center for treatment of his injuries. (Ex. 1 at 83, 93, 98.)

**D. Procedural history**

26. On July 2, 2025, the United States filed a criminal complaint in this Court. (Complaint, attached as Ex. 2.) Aguirre then was taken from the hospital into federal custody. (Ex. 1 at 41.)

27. On July 2, 2025, the State filed a criminal complaint and warrant in the Pima County Consolidated Justice Court.

28. On July 25, 2025, a Pima County, Arizona grand jury indicted Aguirre on 12 felony counts, including first degree murder:

Count One: First Degree Murder of R.M.

Count Two: Attempt to Commit Armed Robbery of R.M.

Count Three: Aggravated Assault with a Deadly Weapon of K.O.

Count Four: Aggravated Assault with a Deadly Weapon of R.S.

Count Five: First Degree Burglary of a Residential Structure belonging to O.Q.

Count Six: Aggravated Assault with a Deadly Weapon of A.Q.

Count Seven: Aggravated Assault with a Deadly Weapon of O.Q.

Count Eight: Aggravated Assault with a Deadly Weapon of A.R.

Count Nine: First Degree Burglary of a Residential Structure belonging to R.T.

Count Ten: Aggravated Assault with a Deadly Weapon of R.T.

Count Eleven: Possession of a Deadly Weapon by an Undocumented Alien

Count Twelve: Possession of a Deadly Weapon by a Convicted Felon

(State Indictment, attached as Ex. 3.)

29. On July 30, 2025, a federal grand jury indicted Aguirre on five felony counts: (1) attempted carjacking resulting in the death of R.M., described in the Federal Indictment as "John Doe," (2) use and discharge of a firearm during and in relation to a crime of violence causing John Does's death, and constituting first degree murder (3) illegal alien in possession of a firearm, (4) illegal reentry of a removed alien, and (5) felon in possession of firearm in and affecting interstate commerce. (Federal Indictment, attached as Ex. 5.)

30. As of the filing of this pleading, the United States has not charged Aguirre for any crimes against victims other than R.M. (*See* Ex. 5.)

**E. Communications from the United States have been inconsistent, contradictory, and devoid of factual or legal support.**

31. As a matter of course, the United States produces defendants in federal custody for proceedings in state court. The United States did just this less than a year ago in *United States v. Samuel Lopez-Ozuna*, CR 24-06035-TUC. This is an ongoing first-degree murder case that arose from the same incident giving rise to both federal and state criminal charges. Without objection, the United States produced Lopez-Ozuna for arraignment in *State v. Samuel Lopez-Ozuna*, Pima County Superior Court no. CR20243146. The United States also produced Lopez-Ozuna for depositions by the State at the Evo A. DeConcini United States Courthouse.

32. Despite historic cooperation between the Pima County Attorney's Office (PCAO) and the United States in many other similar cases, and an initial July 9, 2025, agreement that the United States was "willing to approve your request to writ Aguirre but only for the state IA with an immediate return to federal custody following the IA," (Email exchange between PCAO and the United States, attached as Ex. 4, at 0006) the United States since then has refused multiple written requests from PCAO to produce and make Aguirre available for an initial appearance and arraignment on the Arizona charges. (Ex. 4.)

33. Because the United States has refused to produce and make Aguirre available for an initial appearance and arraignment on the Arizona charges, the State cannot prosecute the criminal charges against him under the State Indictment. As such, the State cannot undertake efforts to preserve critical evidence necessary for its prosecution, including testimony from the asserted victims, including both A.Q. and O.Q.

34. On July 2, 2025, Raquel Arellano, Assistant United States Attorney and Violent Crimes Section Chief, and Adam Rossi, Assistant United States Attorney,

met with members of the Tucson Police Department (TPD) and Pima County Attorney's Office. Present at that meeting were Kimberly Hunley, Chief Deputy Pima County Attorney, and Joshua Moser, Chief Criminal Deputy Pima County Attorney. Arellano and Rossi instructed TPD to cooperate with the United States Attorney's Office and Federal Bureau of Investigation (FBI).

35. At the July 2, 2025, meeting, Rossi, Arellano, Hunley, and Moser spoke about the case. Rossi and Arellano verbally reiterated to Moser the United States's commitment to attempt to accommodate requests for transportation of Aguirre in the future to facilitate his state prosecution.

36. Later on July 2, 2025, the United States filed a criminal complaint in this Court. (Ex. 2.) Aguirre then was taken into federal custody. (Ex. 1 at 41.) Both Arellano and Rossi, after Aguirre's arrest verbally reiterated to Moser the United States's agreement to allow the State to have custody of Aguirre as needed to facilitate his state prosecution.

37. On July 9, 2025, and after repeated requests by the Pima County Attorney's Office, Arellano agreed in writing to approve the State's request to produce Aguirre for an initial appearance in State court but not for any other hearings, including a preliminary hearing where victim testimony would be taken. (Ex. 4 at 0005-0006.)

38. On July 10, 2025, the State responded to Arellano's email, noting the United States's position was not only inconsistent with the long-standing practice between the two offices but also undermined the rights of the victims in the case, some of whom may not live to see the crimes against them prosecuted.

39. On July 29, 2025, after the State obtained the grand jury indictment, the State again requested that the United States make Aguirre available for an initial appearance and arraignment for the purposes of appointing him state court defense

1  counsel and setting depositions to preserve critical victim and eyewitness testimony.
2  (Ex. 4 at 0004.)

3  40.  On August 6, 2025, the United States formally reneged on its offer to make Aguirre available for an initial appearance in state court. Christopher Brown, Chief Assistant United States Attorney, responded via email to Moser, stating "we have decided it is not in the interests of justice to turn over Aguirre to the County on a writ for an initial appearance, or for any other parallel proceedings in state court." (Ex. 4 at 0001-0002.)

41.  In that same email, the United States stated it has "grave concerns" that producing Aguirre for state court proceedings would negatively "impact the integrity of each" case "given the material differences in pretrial procedures in state and federal court." The United States did not attempt to explain what those differences are or how they would affect each case. (Ex 6 at 0001.)

42.  In that same email, the United States cited "victim impact" as a justification for refusing to produce Aguirre for state court proceedings. Exactly the opposite is true, as the United States continues to ignore Aguirre's six other victims. As of the filing of this pleading, the United States has not charged Aguirre with any crimes for the acts he committed against those six victims. (Ex. 4 at 0001.)

**F. The United States's conduct in this case risks spoliating evidence.**

43.  The assertions of fact in ¶¶ 44-47 are supported by the affidavit of E.Q., daughter of A.Q. and O.Q., which will be filed later as Ex. 6.

44.  A.Q. is 78 years old. O.Q. is 76 years old. Upon information and belief, O.Q. was recently diagnosed with leukemia and is prediabetic. She also has trouble remembering things.

45. No one from the United States government has contacted A.Q., O.Q., or A.R.

46. The United States has actual knowledge of the underlying facts in this case, including the ages of A.Q. and O.Q., just two of the victims in the State Indictment, the possibility they may be unavailable to provide critical testimony, and the high likelihood their memories of the incident, as those of any victim of or witness to a crime, will fade with the passage of time. The testimony of the other victims, of varying ages and health conditions, also cannot be preserved unless and until the United States makes Aguirre available to the State for purposes of engaging in pre-trial evidence preservation. The United States's decision to hamstring the State's prosecution of Aguirre potentially constitutes spoliation of evidence that could irreparably harm both the pending federal case against Aguirre as well as the State's ability to prosecute Aguirre, secure justice for his victims, and protect public safety.

47. The United States's decision to hamstring the State's prosecution of Aguirre also irreparably harms the victims whom it continues to ignore.

48. In sum, the United States has offered no coherent factual or legal justification for refusing to produce and make Aguirre available for his state prosecution proceedings. Its justification comprises solely conclusory statements with no explanation or legal support. Its proffered justification is contradictory on its face, and it offends the rights of Aguirre's six other victims who have no voice in his federal prosecution, nor is the United States offering them any justice for the crimes he committed against them. (Ex. 4 at 0001.)

49. The Federal Public Defender has been appointed to represent Aguirre in all proceedings in Federal Court. (*See* 4:25-cr-03393-RM-MAA, Dkt. 5.)

50. The State has secured representation for Aguirre from the Pima County Public Defender's Office for when or if the United States produces him for initial appearance and arraignment in state court.

51. The State stands ready and willing to assist in Aguirre's participation in state court proceedings, including, for example, by facilitating virtual appearances or conducting depositions in the Evo A. DeConcini United States Courthouse, such that the United States need not relinquish physical custody of Aguirre.

## **LEGAL AUTHORITY**

52. Pima County Attorney Laura Conover is the public prosecutor of Pima County, Arizona. She has an Arizona constitutional and statutory mandate to represent the State of Arizona in prosecutions for public offenses within geographical Pima County. Ariz. Const. art. XII, § 3; A.R.S. § 11-532(A)(1).

53. Conover has an Arizona constitutional mandate to safeguard and vindicate the rights of crime victims in Pima County, including each of Aguirre's victims as described in paragraphs 9 through 13, *supra*. Ariz. Const. art. II, § 2.1. Those rights include the right to be treated with fairness, respect, and dignity, and to be free from intimidation, harassment, or abuse, throughout the criminal justice process; the right to be present at and, upon request, to be informed of all criminal proceedings where the defendant has the right to be present; the right to be heard at any proceeding involving a post-arrest release decision, a negotiated plea, and sentencing; the right to confer with the prosecution, after the crime against the victim has been charged, before trial or before any disposition of the case and to be informed of the disposition; the right to receive prompt restitution from the person convicted of the criminal conduct that caused the victim's loss or injury; and the

right to a speedy trial or disposition and prompt and final conclusion of the case after the conviction and sentence. *Id*.

54. The United States has a corresponding obligation to respect the rights of crime victims. Those rights include the right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused; the right not to be excluded from any such public court proceeding; the right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding; the reasonable right to confer with the attorney for the Government in the case; the right to full and timely restitution as provided in law; the right to proceedings free from unreasonable delay; the right to be treated with fairness and with respect for the victim's dignity and privacy; and the right to be informed in a timely manner of any plea bargain or deferred prosecution agreement. 18 U.S.C. § 3771(a).

55. This Court is empowered to grant writs of habeas corpus ad prosequendum pursuant to 28 U.S.C. § 2241(a) to require the United States to produce criminal defendants in federal custody for state court criminal proceedings.

56. This Court is empowered to issue preliminary injunctive relief. Judiciary Act, 1789, ch. 20, 1 Stat. 78; Fed. R. Civ. P. 65(a).

## **RELIEF REQUESTED**

A. A writ of habeas corpus ad prosequendum requiring the United States to produce and make Aguirre available, upon the State's reasonable request, for initial appearance and arraignment and discovery proceedings under the State Indictment in Arizona courts.

B. A hearing on the State's application for preliminary injunction consolidated with a trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2).

C. A preliminary injunction requiring the United States to produce and make Aguirre available, upon the State's reasonable request, for all court and related proceedings for Arizona's prosecution of him pursuant to the State Indictment, including but not limited to initial appearance, arraignment, witness depositions, evidentiary hearings, and trial.

DATED this 15th day of August 2025.

                                              LAURA CONOVER
                                              PIMA COUNTY ATTORNEY

By    /s/ *James W. Rappaport*
         J. William Brammer, Jr.
         James W. Rappaport
         Joshua Moser
         *Deputy County Attorneys*